**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Case No. 1:23-CV-00847-LCB-JEP**

CHRISTEL ENGLAND, KAREN MEYERS, AND ANGELA JOYNER-PERRY, *individually and on behalf of all others similarly situated,*

Plaintiffs,

v.

SELENE FINANCE, LP,

Defendant.

**DEFENDANT SELENE FINANCE, LP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

I. FACTS ..... 2

A. Selene services home mortgage loans and sends default notices. ..... 2

B. Plaintiffs allege the notices conflict with Selene's policies. ..... 3

C. Plaintiffs' theory of liability does not apply to all Plaintiffs or all class members. ..... 5

D. Selene's policies and practices materially changed during the class period. ..... 7

E. Plaintiffs reacted differently to the default notices. ..... 7

II. ARGUMENT AND CITATION OF AUTHORITY ..... 10

A. Legal Standard ..... 10

B. Plaintiffs' proposed class is overbroad. ..... 12

C. Plaintiffs are not typical because they are subject to unique defenses. ..... 14

D. Plaintiffs cannot show predominance. ..... 14

1. Individualized evidence is necessary to prove concrete injury. ..... 15

a. A concrete injury is required to receive relief in federal court. ..... 15

b. Federal courts consider class-member standing on class certification. ..... 16

c. Plaintiffs cannot prove that common questions predominate over individualized questions of standing. ..... 17

d. Plaintiffs' authority is inapplicable after TransUnion. ..... 20

2. Individualized issues surround class member compliance with the contractual notice provision. ..... 21

E. The Court should not certify a class under Rule 23(c)(4). ..... 22

III. CONCLUSION ..... 23

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Alig v. Rocket Mortg., LLC*,
126 F.4th 965 (4th Cir. 2025) ........................ 16

*Branch v. Gov. Employees Ins. Co.*,
323 F.R.D. 539 (E.D. Va. 2018) ........................ 17

*Comcast Corp. v. Behrend*,
133 S. Ct. 1429 (2013) ........................ 10, 11

*Cruz v. Selene Finance, LP*,
No. 23-14297-CIV, 2024 WL 5374001 (S.D. Fla. Nov. 21, 2024) ........................ 21

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ........................ 14

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ........................ 11

*Freeman v. Progressive Direct Ins. Co.*,
149 F.4th 461 (4th Cir. 2025) ........................ 14

*G.T. v. Board of Ed.*,
117 F.4th 193 (4th Cir. 2024) ........................ 10

*Holmes v. Elephant Ins. Co.*,
156 F.4th 413 (4th Cir. 2025) ........................ 21

*Hooker v. Citadel Salisbury LLC*,
No. 21-cv-00384, 2023 WL 3020967 (M.D.N.C. Apr. 20, 2023) ........................ 22, 23

*Lewis v. EquityExperts.org, LLC*,
No. 5:22-cv-302, 2025 WL 35071 (E.D. N.C. Jan. 6, 2025) ........................ 16

*Lezark v. I.C. Sys., Inc.*,
No. 20-cv-403, 2025 WL 1527029 (W.D. Penn. May 29, 2025) ........................ 17, 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................ 15, 19

*Milam v. Selene Fin. LP*,
163 F.4th 416 (7th Cir. 2025) ........ 19

*Mr. Dee's Inc. v. Inmar, Inc.*,
127 F.4th 925 (4th Cir. 2025) ........ 13, 16

*Pierre v. Midland Credit Management, Inc.*,
29 F.4th 934 (7th Cir. 2022) ........ 15, 19

*Pruitt v. Resurgent Capital Services, LP*,
610 F. Supp. 3d 775 (D. Md. 2022) ........ 15

*Shiring v. Tier Technologies, Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) ........ 14

*Spurlock v. Wexford Health Sources, Inc.*,
175 F.4th 232 (4th Cir. 2026) ........ 16

*Stromberg v. Midland Funding, LLC*,
No. 16-9288, 2024 WL 1673360 (D. N.J. Apr. 18, 2024) ........ 17

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006) ........ 11, 22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 15, 16, 20

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ........ 15, 16

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ........ 11

*Whitfield v. Selene Finance LP*,
Case No. 24-14257 (11th Cir.) ........ 21, 22

*Whitfield v. Selene Finance LP*,
No. 5:24cv153, 2024 WL 4933329 (M.D. Ga. Dec. 2, 2024) ........ 22

*Wiseman v. First Citizens Bank & Trust Co.*,
212 F.R.D. 482 (W.D.N.C. 2003) ........ 14

**Statutes and Rules**

15 U.S.C. § 1681 ........ 17

Fed. R. Civ. P. 23 .......... 11, 12

N.C. Gen. Stat. § 45-102 (2023) .......... 3

**Other Authorities**

24 C.F.R. § 203.606(a) .......... 3

## INTRODUCTION

Plaintiffs allege[1] that Selene Finance LP ("Selene", their mortgage loan servicer) sent deceptive notices of default to Plaintiffs and other North Carolina borrowers. Plaintiffs assert this case involves uniform default notices and practices and is well suited to class certification. In reality, evaluating whether Plaintiffs or class members are entitled to relief involves many individualized inquiries that preclude certification.

Plaintiffs' theory of why the notices are deceptive—which Selene disputes—assumes a recipient with a particular set of circumstances. Not all class members—or even all Plaintiffs—had those circumstances. Further, Plaintiffs and all class members must show that the default notice caused them a concrete injury to have standing to sue or receive relief in federal court. Evaluating what impact—if any—a default notice had on each class member will require individualized evidence and adjudication. Finally, many class members had a contractual obligation to provide pre-suit notice and an opportunity to cure before filing suit; evaluating that issue will require more individualized inquiries.

The Court should deny certification for three independent reasons. ***First***, Plaintiffs' motion does not account for the unique factual circumstances their theory of liability requires. As a result, the class is overbroad, *i.e.*, it includes many people who have no claims under Plaintiffs' theory.

---

[1] Plaintiffs sue under the Fair Debt Collection Practices Act (the "FDCPA"), and two state statutes. The Court dismissed Plaintiffs' negligent misrepresentation claim, and Joyner-Perry's FDCPA claim. ECF 21.

***Second***, Plaintiffs' claims are not typical of the class because Plaintiffs are subject to unique defenses. Selene's summary judgment motion shows that no Plaintiff has suffered a concrete injury, so none of them have Article III standing to sue in federal court. Further, two Plaintiffs failed to comply with a contractual condition precedent. Plaintiffs' failure to show typicality independently defeats certification.

***Finally***, common questions do not predominate because the class is rife with individualized questions regarding whether class members suffered a concrete injury. Such individualized questions exist even among the Plaintiffs and will certainly pervade the class. One Plaintiff does not remember receiving the notice or taking any action in response. Other Plaintiffs recall receiving the notice and making payments, but they made some payments even before receiving the notice, and one such Plaintiff said she would have paid regardless of receiving the notice. Plaintiffs claim emotional distress, but even if that was a concrete injury, whether other class members suffered emotional distress is an individualized question. These varying scenarios preclude predominance. Individualized questions about class member compliance with the contractual notice provision also preclude predominance.

For these reasons, Selene asks the Court to deny certification.

## I. FACTS

### A. Selene services home mortgage loans and sends default notices.

Selene services each Plaintiffs' home mortgage loan, meaning Selene (among other things) receives borrower payments, communicates with borrowers, and pursues collection

action when needed. Ex. 1, Harvey Decl., ¶ 32. Plaintiffs' loans are memorialized by a note and secured by a deed of trust. Ex. 1, ¶¶ 33, 34, 53, 54, 66, 67; Exs. 14, 15, 22, 23, 29, 30.

Plaintiffs' notes require them to make monthly mortgage payments. *See, e.g.,* Ex. 14, p. 1, ¶ 4. If Plaintiffs default, their deeds of trust *require* the lender—before accelerating or foreclosing—to send a notice advising of:

> (a) the default, (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.

*See, e.g.,* Ex. 30, p. 13, ¶ 22.[2] North Carolina also *requires* lenders to send defaulted borrowers a notice containing similar information. *See* N.C. Gen. Stat. § 45-102 (2023).

**B. Plaintiffs allege the notices conflict with Selene's policies.**

Selene sent notices to Plaintiffs and class members both under their deeds of trust and under the state statute. For example, Selene sent Meyers a notice stating:

> The mortgage loan associated with the Security Instrument is in default for failure to pay the amounts that came due on 03/01/2023 and all subsequent payments.
>
> To cure this default, you must pay all amounts due under the terms of your Note and Security Instrument, which includes any delinquent payments and regularly scheduled payments. As of 04/17/2023, your loan is due for

---

[2] Meyers's and Joyner-Perry's Deeds of Trust state this notice requirement. England's Deed of Trust requires the lender to follow regulations issued by HUD's Secretary to foreclose. Ex. 15, p. 4, ¶ 9(d). Those regulations contain a similar notice requirement. 24 C.F.R. § 203.606(a) ("prior to initiating any action required by law to foreclose the mortgage, the mortgagee shall notify the mortgagor in a format prescribed by the Secretary that the mortgagor is in default and the mortgagee intends to foreclose unless the mortgagor cures the default.")

> 03/01/203 and the total amount necessary to cure your default is $1,999.16….
>
> The total amount you must pay to cure the default stated above must be received by 6/01/2023. Failure to cure the default on or before the date specified may result in acceleration of the sums secured by the Security Instrument, sale of the property and/or foreclosure by judicial proceeding and sale of the property.

Ex. 26, p. 1. The notice went on to invite Meyers to call Selene to discuss foreclosure alternatives. *Id.*, p. 2.

The notices accurately described Plaintiffs' default and the past-due amount. Ex. 1, ¶¶ 41, 59 and 71. The notices also correctly described Selene's contractual right to refuse payments less than the total amount due. Ex. 23, p. 4, ¶ 1 ("Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.") The notices accurately described Selene's right to accelerate and foreclose if Plaintiffs failed to cure their default. Ex. 23, p. 14, ¶ 22 ("If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale incurred in pursuing the remedies provided.")

Plaintiffs do not claim Selene demanded amounts that Plaintiffs didn't owe or threatened remedies Selene didn't have. Instead, Plaintiffs allege that the notices were inconsistent with Selene's policies in two ways. ***First***, Plaintiffs allege that the notice threatens to begin foreclosure *immediately* after the cure period expires.[3] ECF No. 1, ¶ 60. Thus, Plaintiffs allege that the Meyers notice threatens to foreclose on June 2, 2023, when

---

[3] Selene disputes that interpretation.

the loan was 91 days delinquent. Ex. 26. Plaintiffs allege that this language is inconsistent with Selene's policy, which would typically not refer a loan to foreclosure until at least 120 days of delinquency. Ex. 1, ¶ 22; Ex. 4.

***Second***, Plaintiffs allege that the notice threatens to foreclose unless the borrower pays the full past due amount. ECF No. 1, ¶ 55. Plaintiffs allege this is inconsistent with Selene's practice of accepting less than the total past due amount and postponing foreclosure, but only if: (i) the payment was at least one full monthly payment; (ii) the payment left the loan no more than 60 days past due; (iii) the loan was fewer than six months past due; and (iv) the loan had not been referred to foreclosure. Ex. 1, ¶ 19.[4]

## C. Plaintiffs' theory of liability does not apply to all Plaintiffs or all class members.

Plaintiffs' theory of liability depends on when during a delinquency Selene sent default notices, but there was not a uniform timeline. Until October 2023,[5] Selene's policy was to send a default notice to North Carolina borrowers *no earlier than* 45 days of delinquency, but many factors could delay that. Ex. 1, ¶ 14. Selene would not send a default notice if a borrower filed for bankruptcy, had applied for loss mitigation, or was protected by the Servicemembers Civil Service Relief Act. Ex. 1, ¶ 14. Borrowers whose loans were in default when servicing transferred to Selene could also receive default notices after more than 45 days of delinquency. Ex. 1, ¶ 16. Thus, many class members received default

---

[4] After November 2025, Selene's practice was the same except that the payment must leave the loan no more than ***30*** days past due. Ex. 1, ¶ 20.

[5] Selene's policy was the same after October 2023 except that Selene would send the notice no earlier than 65 days of delinquency. Ex. 1, ¶¶ 14, 15.

notices dated later than 75 days of delinquency and with cure periods that expired after more than 120 days of delinquency,[6] when Selene would refer loans to foreclosure. Ex. 1, ¶¶ 17, 18. Plaintiffs' theory of liability would not apply to those notices.

Plaintiffs themselves received default notices at materially different times. England attached to the complaint a default notice sent when she was seven months delinquent. ECF No. 1-2, Ex. 1, ¶ 40; Ex. 18, 8/1/23 Ltr, p. 1. Under Plaintiffs' interpretation, the default notice threatened foreclosure no sooner than 255 days of delinquency, after Selene would refer a loan to foreclosure. Six other notices England received also had cure deadlines after more than 120 days of delinquency. Ex. 18, 3/18/22 Ltr., 4/26/22 Ltr., 8/30/23 Ltr., 9/6/23 Ltr., 9/6/23 Ltr. Similarly, Joyner-Perry's default notice was sent when she was three months delinquent. Ex. 1, ¶ 70; Ex. 32, p. 1. Under Plaintiffs' interpretation, the notice threatened foreclosure no sooner than 135 days of delinquency, after Selene would refer a loan to foreclosure.

The different timelines also impact Plaintiffs' theory regarding what payments Selene would accept. England received one of her default notices when she was seven months behind. Selene's policy was to accept only the full cure amount because England was at least six payments past due. Ex. 1, ¶ 19. Three other notices England received were similarly dated when the loan was at least six months past due. Ex. 1, ¶ 43; Ex. 18, 8/30/23

---

[6] All default notices Selene sent to North Carolina borrowers during the class period contained a 45-day cure period, so sending a notice on or after 75 days of delinquency would result in the cure period expiring on or after the 120th day of delinquency (75 + 45 = 120). Ex. 1, ¶ 17.

Ltr., 9/6/23 Ltr., 9/6/23 Ltr. Plaintiffs' theory that Selene would have accepted less than the full past-due amount does not apply to these notices.

**D. Selene's policies and practices materially changed during the class period.**

During the class period, Selene's policies and practices changed in three different ways material to Plaintiffs' allegations. ***First***, as noted above, Selene sent default notices to North Carolina borrowers starting at 45 days delinquent prior to October 2023 and starting at 65 days delinquent thereafter, subject to the exceptions described above that would delay sending the notice. Ex. 1, ¶ 14; Ex. 2. Given the 45-day cure period, these notices could have cure periods as short as 90 to 110 days of delinquency. As noted above, due to exceptions and other factual circumstances, cure periods frequently exceeded 120 days of delinquency throughout the class period.

***Second***, as noted above, Selene would accept less than a full past-due amount that brought the loan within 60 days past due before November 2025 and within 30 days past due after November 2025. Ex. 1, ¶¶ 19, 20. Other requirements applied before and after November 2025, including that the loan be less than six payments past due. *Id.*

***Third***, Selene changed the form of the two default notices it sent to North Carolina borrowers several times. Ex. 1, ¶¶ 10-12; Exs. 7-11.

**E. Plaintiffs reacted differently to the default notices.**

Plaintiffs had different experiences with Selene and different reactions to the notices.

**Christel England.** Selene began servicing England's loan on August 1, 2014. Ex. 1, ¶ 35; Ex. 16. England's loan was often in default, which she attributed to illness and

unemployment. Ex. 1, ¶ 37; Ex. 33, England Tr., pp. 47:22-24; 55:2-56:8; 153:11-17; 167:1-168:8. Selene sent England eleven default notices (both under the deed of trust and under the state statute) in 2022 and 2023. Ex. 1, ¶ 40; Ex. 18. England submitted documents to Selene for foreclosure alternatives. Ex. 1, ¶ 44; Ex 19, Submissions. In 2020, England executed a modification agreement that brought her loan current. Ex. 1, ¶ 38; Ex. 17, Modification Agreement. England thus understood that options existed to address her delinquency outside of foreclosure. Ex. 33, England Tr., pp. 97:23-98:4.

Selene advised England it would accept less than the full past-due amount. On April 7, 2023, England's loan was four payments past due, and Selene advised England by phone that Selene would accept two payments in the amount of $1,166.94. Ex. 1, ¶ 47; Ex. 20. On April 24, 2023, Selene discussed with England by phone the $1,166.94 payment and asked England to call Selene once the payment had cleared to set up a repayment plan. Ex. 1, ¶ 49; Ex. 21. Thus, England knew Selene's payment-acceptance practices.

England does not remember receiving any default notices or taking any action in response. Ex. 2, England Tr., pp. 107:14-17; 111:2-112:22; 114:16-115:18; 118:18-120:5; 136:22-137:17; 139:7-140:8; 141:21-142:15; 151:25-152:22; 157:13-159:15; 160:1-23; 161:16-162:17; 163:15-164:10. England regularly experiences lost and wrong mail at her home. *Id.*, pp. 73:19-74:4. England never brought her loan current during cure periods set forth in default notices she received. Ex. 1, ¶ 51. England made no payments from February 9, 2023, until June 18, 2026. Ex. 1, ¶ 52; Ex. 33, England Tr., pp. 152:24-153:8; 159:21-25; 164:16-18. Despite having no memory of receiving them, England claims the notices

caused her emotional distress, for which she has not sought treatment. ***Id.***, pp. 168:21-169:12; 171:3-21.

**Karen Meyers.** Meyers received one default notice dated April 17, 2023. Ex. 1, ¶ 58; Ex. 26. Meyers claims the notice "devastated" her and her family. Ex. 34, Meyers Tr., pp. 82:2-7. Meyers has not sought mental-health treatment. Ex, 36, Meyers Response to Selene Interrogatory No. 7.

When she received the default notice, Meyers understood that she had options to avoid foreclosure (*e.g.*, repayment plans and loan modification) based on an April 11, 2023, letter from Selene. Ex. 1, ¶ 57; Ex. 34, Meyers Tr., pp. 77:6-79:14. Meyers called Selene after receiving the default notice to discuss foreclosure alternatives. Ex. 1, ¶ 61; Ex. 34, Meyers Tr., pp. 101:7-23. Meyers submitted a request for forbearance due to financial hardship after receiving the default notice. Ex. 1, ¶ 62; Ex. 27, Forbearance Request; Ex. 34, Meyers Tr., pp. 102:1-103:21. Selene responded on May 10, 2023, asked for additional documents, and stated that once the documents were submitted, Selene would not refer the loan to foreclosure while it considered her request. Ex. 1, ¶ 63; Ex. 34, Meyers Tr., pp. 110:3-112:22; Ex. 28. Meyers understood that portion of the letter but ultimately did not need assistance because she received assistance from a Homeowners Assistance Fund. Ex. 34, Meyers Tr., pp. 112:18-114:2.

Meyers made one past-due loan payment on April 17, 2023, though not in response to the default notice dated that the same day. Ex. 1, ¶ 60; Ex. 34, Meyers Tr., pp. 99:8-22. Meyers made two more loan payments in May 10, 2023, bringing the loan current. Ex. 1,

¶ 64; Ex. 34, Meyers Tr., pp. 113:10-114:17. Meyers could not recall where she got the money to make payments. Ex. 34, Meyers Tr., pp. 115:1-24; 140:19-141:3.

**Angela Joyner-Perry.** Joyner-Perry received a single default notice dated September 29, 2022. Ex. 1, ¶ 70; Ex. 32. Joyner-Perry "panicked" and was scared she would be "homeless" when she first read the notice. Ex. 35, Joyner-Perry Tr., pp. 73:2-74:12. Joyner-Perry did not seek medical treatment. *Id.*, pp. 164:8-17. Her concerns were alleviated when she brought her loan current. *Id.*, pp. 110:24-111:9.

Joyner-Perry made two payments on September 29, 2022—not in response to the default notice dated that same day—leaving her one payment behind. Ex. 1, ¶ 72. Joyner-Perry made another payment to bring her loan current through the September 1, 2022 payment on October 7, 2022. Ex. 1, ¶ 73. Joyner-Perry's brother gave her the money she used to make the payment as a gift; he does not expect her to pay it back or to pay interest. Ex. 35, Joyner-Perry Tr., pp. 147:1-20; 169:18-170:13. Joyner-Perry did not pay more than she owed under the loan. *Id.*, pp. 152:6-153:3; 153:7-21. The default notice did not cause Joyner-Perry to bring her loan current; she would have done that anyway to avoid adverse credit consequences. *Id.*, pp. 148:23-149:4.

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1429, 1432 (2013) (citation omitted); *G.T. v. Board of Ed.*, 117 F.4th 193, 202 (4th Cir. 2024) (same).

Plaintiffs have the burden of proving compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.") (emphasis original); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (affirming denial of certification; "we have stressed in case after case that it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but that it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23.") (emphasis original).

Certification requires a "rigorous analysis." *Comcast*, 133 S. Ct. at 1432; *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) ("the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied."). Courts should resolve merits issues as needed to address Rule 23's requirements. *Comcast*, 133 S. Ct. at 1433 (certification analysis "requir[es] a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim.").

Plaintiffs seek to certify a class under Rule 23(b)(3). ECF No. 45, p. 17. They must prove all four requirements of Rule 23(a), including that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Plaintiffs must also prove the requirements of Rule 23(b)(3), including that

common questions, "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

**B. Plaintiffs' proposed class is overbroad.**

Plaintiffs seek to certify two classes of North Carolina borrowers, primarily defined by the fact that the class members received a default notice during the class period. ECF No. 45, p. 9. Plaintiffs' fact-specific theory of liability does not allege the default notice is misleading on its face, but only under certain circumstances.[7] Plaintiff alleges that the notice: (i) threatens foreclosure before 120 days of delinquency when Selene's policy is to refer most loans starting at 120 days of delinquency; and (ii) states that only payment of the full past-due amount will postpone foreclosure when Selene's policy was to accept certain amounts less than that, but only if the loan were less than six months past due. Thus, whether Plaintiffs' theory applies depends on how delinquent the loan is when Selene sends the notice.

As noted above, Selene did not send the default notices at the same point in delinquency to all class members. While Selene's policy dictated the *earliest* point at which it would send a default notice (between 45 and 65 days delinquent), exceptions often caused Selene to send notices later than that.

Plaintiffs' own varied circumstances illustrate the mismatch between their theory of liability and the scope of their class. Seven of the eleven default notices England received, and the sole notice Joyner-Perry received, *could not* be read—even by Plaintiffs—to

---

[7] Selene disputes the notice is misleading for any borrower.

threaten foreclosure sooner than 120 days of delinquency. Similarly, Selene sent four of England's default notices—including the notice attached to the complaint—when she was at least six months past due, meaning Selene's policy was to accept nothing less than the full past-due amount. Those notices could not be considered misleading even under Plaintiffs' interpretation.

The Fourth Circuit rejected certification where the plaintiff failed to show that 32% of the class suffered an injury. *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 934 (4th Cir. 2025) ("the presence of 32% of uninjured members in a proposed class strikes us as much too high"). The court held that "the high share of class members with no demonstrable injury presented a predominance problem," and "also raises Article III standing concerns." *Mr. Dee's*, 127 F.4th at 933-34.

Plaintiffs present no evidence to show that all putative class members received default notices: (i) whose cure period expired within fewer than 120 days of delinquency; or (ii) fewer than six months past due such that Selene would have accepted less than the full amount past due. Plaintiffs' own facts show how frequently borrowers can fall outside Plaintiffs' theory of liability. Plaintiffs were obligated to limit the class accordingly, but they do not connect their theory of liability to their class definition. The Court should deny certification for this reason alone. *Mr. Dees*, 127 F.4th at 931 ("it is the burden of the party seeking class certification, not the district court's, to demonstrate compliance with Rule 23.")

**C. Plaintiffs are not typical because they are subject to unique defenses.**

Plaintiffs fail to show their claims are typical under Rule 23(a)(3). Typicality means that proof of plaintiff's claim tends to establish the class's claims. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (affirming denial of certification; "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" (citation omitted)). Typicality is defeated if a plaintiff is subject to unique defenses. *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (denying certification; "Yet, even where a putative class representative's claim is typical, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." (citation omitted); *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482, 488 (W.D.N.C. 2003) (denying certification; "In the current case, the putative class representatives' claims may be similar to the class's claims, but their defenses are unique and, therefore, fail to meet the requirements of Rule 23(a)(3).")

Plaintiffs here cannot show typicality because they are subject to unique defenses, *i.e.*, lack of Article III standing and failure to comply with the contractual notice provision. *See* ECF Nos. 55, 56 (Selene's MSJ). Resolving these defenses as to Plaintiffs will not resolve them as to the class, so Plaintiffs are not typical. The Court should deny certification for this additional reason.

**D. Plaintiffs cannot show predominance.**

Predominance under Rule 23(b)(3) requires proof that common issues "are more prevalent or important than the … individual issues." *Freeman v. Progressive Direct Ins.*

*Co.*, 149 F.4th 461, 466 (4th Cir. 2025) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)). Here, common issues do not predominate because of two individualized issues.

**1. Individualized evidence is necessary to prove concrete injury.**

**a. A concrete injury is required to receive relief in federal court.**

As discussed in Selene's summary judgment motion, a federal-court plaintiff has the burden of proving "standing" under Article III, *i.e.*, "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A statutory violation alone is insufficient. *Id.* at 426 ("Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court.") (emphasis original). Where a plaintiff alleges a misleading statement under the FDCPA, a plaintiff must prove detrimental reliance to prove a concrete injury. *Pruitt v. Resurgent Capital Services, LP*, 610 F. Supp. 3d 775, 781 (D. Md. 2022) ("detrimental reliance is so central a feature of fraud and negligent misrepresentation that Ms. Pruitt must at least show that she relied on the Resurgent Letter to her detriment in some way."). *See also Pierre v. Midland Credit Management, Inc.*, 29 F.4th 934, 939 (7th Cir. 2022) (finding lack of standing and reversing judgment for plaintiff in FDCPA case because plaintiff "didn't make a payment, promise to do so, or otherwise act to her detriment in response to anything in or omitted from the letter.")

**b. Federal courts consider class-member standing on class certification.**

Class members must possess Article III standing to receive relief in federal court. *TransUnion*, 594 U.S. at 431 ("Every class member must have Article III standing in order to recover individual damages.") (citing *Bouaphakeo*, 577 U.S. at 466 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."))

In the Fourth Circuit, courts must address class-member standing at certification. *Spurlock v. Wexford Health Sources, Inc.*, 175 F.4th 232, 251 (4th Cir. 2026) ("[c]oncerns about potential uninjured, unnamed class members are more appropriately addressed in the context of analyzing whether the proposed class meets Rule 23(b)(3)'s predominance requirement.") Plaintiffs cite *Spurlock* to say that not all class members must have standing (ECF 45, p. 15), but that referred to justiciability, *i.e.*, subject-matter jurisdiction. *Id.* *Spurlock* recognized that "[i]f a class includes some percentage of uninjured class members, then the proposed class may lack predominance." *Id. See also Alig v. Rocket Mortg., LLC*, 126 F.4th 965, 976 (4th Cir. 2025) (reversing certification; "[a]t bottom, the plaintiffs' class-wide showing in this case is simply 'too speculative to support Article III standing'") (quoting *TransUnion*); *Mr. Dee's*, 127 F.4th at 934 ("attempting to define a class with such a high share of uninjured members also raises Article III standing concerns").

District courts have denied certification in FDCPA cases because individualized issues regarding concrete injury defeat predominance. *Lewis v. EquityExperts.org, LLC*,

No. 5:22-cv-302, 2025 WL 35071, * 9 (E.D. N.C. Jan. 6, 2025) (denying certification in part based on lack of standing for portion of class; "the court still must examine whether 'common questions predominate over individual questions' regarding standing.") (citation omitted); *Lezark v. I.C. Sys., Inc.*, No. 20-cv-403, 2025 WL 1527029, * 5 (W.D. Penn. May 29, 2025) ("determining each individual's standing will require resolving myriad individualized questions that will overwhelm common questions regarding [defendant's] liability." (citation omitted)); *Stromberg v. Midland Funding, LLC*, No. 16-9288, 2024 WL 1673360, (D. N.J. Apr. 18, 2024) ("it is not clear from the proposed class that all members have standing, as the class definition says nothing about adverse effects stemming from the collection letters in question.") *See also Branch v. Gov. Employees Ins. Co.*, 323 F.R.D. 539, 552 (E.D. Va. 2018) (denying certification in Fair Credit Reporting Act case; "the possibility that some class members did not suffer injuries causes individual injury issues to predominate.").

**c. Plaintiffs cannot prove that common questions predominate over individualized questions of standing.**

Here, individualized questions abound regarding whether the default notice caused a concrete injury to class members, so Plaintiffs cannot meet their burden of proving that common questions predominate.

***First***, did a class member even review the default notice? Plaintiff England received eleven default notices and cannot remember even one. Nor can she remember taking any actions in response. Similarly situated class members would have no concrete injury.

***Second***, did class members who reviewed the notice take any action in reliance on the notice? Article III standing in an FDCPA misleading-statement case requires detrimental reliance. England cannot recall any action she took in reliance on any notice, and Selene's records show she made no payments after receiving several notices. Nor did she ever pay the full past-due amount within the cure period, which is the harm Plaintiffs allege the notice creates. Even where England made a payment, there is no evidence that the notice prompted her to do so rather than a typical impulse to pay an existing debt and avoid foreclosure. Class members who cannot show that they took any action in reliance on the notice would lack a concrete injury.

***Third***, were any class members' actions caused by being misled? The default notices specifically invited borrowers to contact Selene to discuss options to avoid foreclosure. Exs. 18, 26, 32. England and Meyers did just that, and other class members may have done the same. England understood she had multiple options to address a delinquency based on prior defaults and past work with Selene on loss mitigation. England also spoke to Selene about her ability to pay only some of what was due. Meyers understood from prior correspondence that she had options to deal with her delinquency, so she applied for payment forbearance immediately after receiving the notice. Meyers and Joyner-Perry both made payments the same day Selene mailed the notice, showing the notice did not cause the payments. Joyner-Perry explicitly said she would have paid regardless of the notice because she—like many—wants to avoid negative credit reporting. In short, borrowers make past-due payments for many reasons; there is no reason to presume that all such payments were induced by alleged misstatements in the default notice.

***Fourth,*** was class member action (e.g., a payment) in reliance on an alleged misstatement detrimental? In a case filed by the same attorneys against Selene based on the same theory, the Seventh Circuit recently suggested that paying what is owed is not a concrete injury:

> As this case came to us, we questioned whether Milam had alleged a concrete injury sufficient to establish Article III standing. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); see also *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938–39 (7th Cir. 2022) (collecting cases applying the concrete injury requirement to FDCPA claims). After all, Selene's letter prompted her to make a payment that both sides agreed she owed and was overdue.

*Milam v. Selene Fin. LP*, 163 F.4th 416, 418 (7th Cir. 2025). The court ultimately found that plaintiff had pled a concrete injury for two reasons. First, she alleged her payment did not save her extra interest or avoid other expenses or negative consequences. *Id.* at 419. Second, she alleged that her payment cost her overdraft fees when she tried to pay other expenses. *Id.* Meyers and Joyner-Perry paid only what they owed, and they avoided negative consequences by doing so (credit reporting, late fees, and property inspection fees). Ex. 1, ¶¶ 23-25. Further, Meyers and Joyner-Perry incurred no additional expense by making their past-due payments. Meyers does not know where she got the money for her payments, and Joyner-Perry made her past-due payments with a gift from her brother that she has not repaid and need not repay. Class members who similarly paid only what they owed suffered no financial harm and thus have no concrete injury.

***Fifth***, did the alleged misstatement cause class members emotional distress? Selene's summary judgment motion shows that emotional distress alone is not a concrete injury. But even if it was, determining this for any class member requires individualized

evidence. And the evidence must be detailed. Was any emotional distress caused simply by being in default and potentially facing foreclosure (stressful events not caused by Selene) or was the distress "likely caused by the defendant," as required for Article-III standing. *TransUnion*, 594 U.S. at 423. In other words, did a class member experience distress at the specific prospect of foreclosure beginning after *90 to 110* days of delinquency that the class member would *not* have experienced if the notice had said foreclosure would begin after *120* days of delinquency? In short, were the extra 10 to 30 days the source of distress? Such questions cannot be resolved with classwide evidence.

Selene is entitled to investigate these issues for each class member to determine who, if anyone, suffered concrete injuries. Selene's investigation, "could ostensibly involve deposition testimony, direct and cross examination, and the production of documents and medical records." *Lezark*, 2025 WL 1527029, * 5. This precludes predominance.

**d. Plaintiffs' authority is inapplicable after *TransUnion*.**

Plaintiffs' motion does not address Article III standing or say how to address concrete injury on a classwide basis. Plaintiffs argue that courts "routinely certify classes" in FDCPA cases because, "there is no requirement the recipients rely upon the letters if there is a misrepresentation in the letters." ECF 45, p. 9. This ignores *TransUnion* and its progeny, which hold that concrete injury requires reliance. Plaintiffs cite a North Carolina state Supreme Court case, but Article III does not apply to state courts. Plaintiffs also cite federal decisions that pre-date *TransUnion* and that do not discuss concrete injuries. ECF 45, pp. 9-10, 17-18. Those stale cases provide no support.

Plaintiffs cite *Cruz v. Selene Finance, LP*, No. 23-14297-CIV, 2024 WL 5374001, (S.D. Fla. Nov. 21, 2024), which certified a class in a similar case. This Court should not rely on *Cruz* for several reasons. ***First***, *Cruz* relied heavily on emotional distress as a concrete injury, which the Fourth Circuit has rejected. *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 434-35 (4th Cir. 2025) ("Accordingly, we hold that *if* time spent and emotional distress felt are concrete injuries, they may serve as the sole basis for standing to recover damages only when incurred in response to a separate imminent harm. They do not suffice standing on their own.") ***Second***¸ the court in *Cruz* improperly shifted the burden to defendant to disprove Article III standing. *Cruz*, 2024 WL 5374001, *13 ("Defendant provides no record evidence to indicate that a significant number of class members did not receive or read the Default Notice and therefore failed to act in reliance or face any downstream consequences.") ***Finally***, *Cruz* is stayed pending the Eleventh Circuit's decision in *Whitfield v. Selene Finance LP*, Case No. 24-14257 (11th Cir.), which is considering whether emotional distress is a concrete injury in the Eleventh Circuit.

**2. Individualized issues surround class member compliance with the contractual notice provision.**

Selene moved for summary judgment based on Meyers's and Joyner-Perry's failure to comply with their contract's notice provision. ECF No. 56; Ex. 23, ¶ 20; Ex. 30, ¶ 20.

This issue will require individualized inquiries into factual issues such as: (i) whether the borrower's deed of trust contained a notice-and-cure provision; (ii) whether the borrower complied with the provision; (iii) whether a particular loan owner's servicing agreement rendered Selene an "assign" of the lender able to enforce the notice provision;

and (iv) whether a loan owner assigned a borrower's deed of trust to Selene, thereby rendering Selene an assign. *See Whitfield v. Selene Finance LP*, No. 5:24cv153, 2024 WL 4933329, at **8-9 (M.D. Ga. Dec. 2, 2024) (finding Selene was entitled to enforce notice-and-cure provision in borrower's security deed as "an assignee of servicing rights to the loan" based, in part, upon Selene's appointment "as power of attorney with rights to demand payment to [the loan owner] via necessary legal methods").[8] These individualized questions further preclude predominance. *See Thorn*, 445 F.3d at 328-29 (affirming denial of class certification under Rule 23(b)(3) where individualized questions regarding defendant's statutes of limitations defense predominated over common issues).

**E. The Court should not certify a class under Rule 23(c)(4).**

Plaintiffs alternatively argue that the Court should certify a liability-issues class under Rule 23(c)(4). ECF 45, p. 20. "The language of Rule 23(c)(4)…speaks of certifying particular issues 'when appropriate,' and thus [c]ourts should use Rule 23(c)(4) only where resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *Hooker v. Citadel Salisbury LLC*, No. 21-cv-00384, 2023 WL 3020967, at *4 (M.D.N.C. Apr. 20, 2023) (citation omitted).

Plaintiffs' request for a class on the issue of liability ignores the individualized circumstances surrounding Article III standing for each class member, which preclude predominance. Plaintiffs fail to show that issue certification under Ruler 23(c)(4) would materially advance the litigation. *See Hooker*, 2023 WL 3020967, at *17 ("At bottom, the

[8] *Whitfield* is currently on appeal at the Eleventh Circuit as Case No. 24-14257.

party seeking certification of an issue class under Rule 23(c)(4) has the burden of demonstrating why the issue class is 'appropriate'—that is how litigating certain issues on a class-wide basis rather than individually will move the case forward in a significant and efficient manner." (citation omitted).

## I. CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Dated: August 31, 2026


*/s/ D. Kyle Deak*_______________

D. Kyle Deak
NC Bar No.: 35799
**TROUTMAN PEPPER LOCKE LLP**
301 S. College Street, 34th Floor
Charlotte, NC 28202
Tel: 919-835-4133
kyle.deak@troutman.com

*Attorneys for Defendant Selene Finance LP*

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing document complies with the word count limits contained in LR 7.3(d)(1).

*/s/ D. Kyle Deak*_______________
D. Kyle Deak